[Cite as *Brown v. Harris*, 2017-Ohio-2607.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| JAILYNN BROWN, et al. | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27069 |
| | : | |
| v. | : | Trial Court Case No. 2014-CV-5144 |
| | : | |
| ANDRE T. HARRIS, SR., et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of April, 2017.

. . . . . . . . . . .

NATHAN J. STUCKEY, Atty. Reg. No. 0086789, 735 North Limestone Street, Springfield, Ohio 45503
    Attorney for Plaintiff-Appellant

ALAN TRENZ, Atty. Reg. No. 0013521, 10403 Harrison Avenue, Suite 400, Harrison, Ohio 45030
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Plaintiff-appellant, Jailynn Brown, appeals from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment in favor of defendants-appellees, Raven Evans-Harris and Charlotte Harris, in a personal injury action that arose from Jailynn falling and tearing her ACL during a cheerleading practice at the Harris residence. For the reasons outlined below, the judgment of the trial court will be affirmed.

### I. Events Leading Up to Jailynn's Injury

**{¶ 2}** In the spring or summer of 2012, Jailynn, a high school sophomore, learned from a friend that Raven, a former high school and college cheerleader, was helping a group of high-school-aged girls form a cheerleading squad with the assistance of another former cheerleader, Kendra Fritz. Jailynn had some experience cheerleading and was interested in joining the squad. As a result, Jailynn and some other interested girls met Raven and Kendra at a local church where they received information about the squad.

**{¶ 3}** Jailynn claimed that she tried out, made the squad, and attended practices approximately every other day thereafter. It is undisputed that Raven and Kendra volunteered their time, as Jailynn paid no fee nor signed any waiver to participate. Although there is a dispute as to whether an official team was formed during Jailynn's participation, the parties agree that the squad was eventually organized into a more official team called the "All City Airmen," also known as the "ACA," which Raven and Kendra managed and coached.

**{¶ 4}** The squad practiced at various locations in Dayton, including local parks and

the residence of Raven's mother and stepfather, Charlotte and Dr. Andre T. Harris, Sr.[1] When practices were held at the Harris residence, the team would occasionally take part in conditioning and fitness training with Charlotte, who coaches basketball and is known in the community as "Coach Char." Charlotte is not a cheerleading coach and only attended practices when they were at her house. Jailynn admitted that "Coach Char" did not provide instruction during practice.

{¶ 5} There is no dispute that Raven and Kendra instructed the team on various cheerleading skills, which included "stunting." Stunting involves lifting moves where a small group of girls called "bases," mount and lift up another girl, the "flyer," by her feet. The bases then cradle and catch the flyer as she comes down from the lift. The majority of the girls on the team, including Jailynn, were new to stunting. The team initially practiced stunts called the "half" and "full." Jailynn, who acted as a flyer, claimed that prior to September 10, 2012, she had successfully performed the half and full many times during practice.

{¶ 6} On September 10, 2012, practice was held at the Harris residence. Jailynn claims that this was the first practice that Raven taught a new stunt called the "lib" or "liberty." Unlike a half and full, during a liberty, the flyer is supposed to go up on one foot as she is lifted by the bases. According to Jailynn, Raven showed the bases where their hands were supposed to go and also showed the flyers what to do when they were lifted in the air.

{¶ 7} Following Raven's instructions, Jailynn attempted the liberty in the grassy front yard of the Harris residence, which Jailynn claims was uneven and sloped. There

---

[1] At all relevant times, Raven did not live with her mother and Dr. Harris.

is no dispute that no mats were used during the practice. Jailynn claims that her first attempt at the liberty was unsuccessful, but that the bases cradled her to the ground safely. After the first failed attempt, Jailynn claimed that Raven told her group to "get it together" and then went to help another group that was attempting the stunt.

{¶ 8} Jailynn claims her group waited until Raven returned to try the stunt again. During Jailynn's second attempt, the bases did not catch her and she fell to the ground on her left side with all her weight on her left leg. When Jailynn tried to get up from the fall she immediately felt pain in her leg and started crying. Jailynn later went to the hospital and was diagnosed with a torn ACL, which required surgery.

{¶ 9} Jailynn claimed that there were four girls spotting her when she attempted the liberty. Similarly, Raven claimed there were three people underneath Jailynn, and possibly a back spotter, although Raven was uncertain whether a back spotter was in place. While Jailynn claimed that Raven was present when she performed the liberty, Raven claimed that she turned her attention away to answer a question when Jailynn fell. Charlotte was not in the front yard when the incident happened and Kendra was not at practice. While Dr. Harris had no affiliation with the team, he came outside to assist Jailynn after she fell.

## II. Course of Proceedings

{¶ 10} Jailynn and her mother, Marketa Watkins, filed a personal injury action that alleged claims of negligence and loss of consortium against Raven, Charlotte, and Dr. Harris for the injury Jailynn sustained at the Harris residence. After written discovery and depositions, Jailynn and Marketa were permitted to amend their complaint so as to

conform to the evidence and raise additional claims of reckless and/or intentional conduct.

{¶ 11} Following additional discovery, the Harrises filed a motion for summary judgment alleging that Jailynn and Marketa could not recover for Jailynn's injuries because Jailynn assumed the inherent risks associated with cheerleading. Jailynn and Marketa then filed a response asserting that summary judgment is not appropriate because a question of fact remains as to whether the Harrises' conduct was reckless and caused Jailynn's injury. In reply, the Harrises argued that Dr. Harris did not owe any duty to Jailynn, Charlotte did not breach any duty owed to Jailynn, and that Raven's conduct toward Jailynn was not in reckless disregard of her safety.

{¶ 12} In support of their positions on summary judgment, each party attached an expert affidavit to their motion giving an opinion as to whether Raven and Charlotte's conduct at the cheerleading practice was reckless. In reaching their opinions, both experts reviewed the deposition testimony of Jailynn, Raven, Charlotte, and Marketa.[2]

{¶ 13} Jailynn's expert, Dr. Marc Rabinoff, is a Professor Emeritus in the Human Performance and Sport Department at the Metropolitan State University of Denver, who has over 45 years of experience educating, training, and coaching cheerleaders, gymnasts, and other coaches. In his affidavit, Rabinoff cited portions of the American Association of Cheerleading Coaches and Administrators Cheerleading Safety Manual and the USA Gymnastics Safety Manual. Based on these resources, Rabinoff opined that Raven and Charlotte "consciously subjected the members of the team, including Jailynn Brown, to a substantial and unjustifiable risk of harm," and thus, "acted recklessly." Specifically, Rabinoff claimed that Raven failed to implement proper instruction or training

---

[2] The transcript of Marketa's deposition was not filed with the trial court or this court.

required for safe stunting because Raven failed to: (1) directly supervise the liberty stunt at issue; (2) ensure there were mats or alternative safety measures in place; (3) properly instruct on stunting and spotting techniques; and (4) provide an appropriate training environment, as he opined that the uneven front-yard area was an inappropriate training surface for stunting.

{¶ 14} The Harrises' expert, Lenee M. Buchman, has an extensive background in coaching cheerleading at the college level and is currently the cheerleading coordinator for the State of Ohio with the Ohio Association of Secondary School Administrators. In her affidavit, Buchman opined that the circumstances surrounding Jailynn's injury are common in Ohio, and that "cheerleading groups and those who wish to be involved in cheerleading many times organize without a formal structure[.]" Buchman opined that while the practices held by these informal groups may not comply with all of the recommended procedures recognized by the American Association of Cheerleading Coaches and Administrators and the National Association of State High School Associations, such practices do not amount to reckless conduct by the persons supervising or conducting the practices. In Buchman's opinion, Jailynn was properly surrounded by girls who were there to assist and protect her during the liberty stunt, which Buchman characterized as a "fairly basic" stunt. She further noted that Raven was present at the time of the stunt despite the fact that she may not have been watching the stunt when the injury occurred.

{¶ 15} After reviewing the motions and evidence, the trial court granted summary judgment in favor of Raven, Charlotte, and Dr. Harris. The trial court found that because Dr. Harris had no involvement in the cheerleading group, any liability on his part must

arise from premises liability, and that there was no evidence that he breached his duty to keep his property in a reasonably safe condition. The trial court also found that neither party disputed that cheerleading was a recreational activity, and that in order for Jailynn to recover against Raven and Charlotte, their conduct toward Jailynn had to be reckless or intentional.

{¶ 16} The trial court found that Jailynn "practiced various stunts during multiple practices, and was getting more and more comfortable with them, prior to sustaining her injury." Decision, Order, and Entry Sustaining Defendants' Motion for Summary Judgment (Mar. 3, 2016), Montgomery County Court of Common Pleas Case No. 2014-CV-05144, Docket No. 65, p. 6. In addition, the court noted that Jailynn and her teammates were not injured when performing the stunts during prior practices. The court also found that stunts are a common component of cheerleading and that a risk of falling is inherent in performing stunts that involve lifting participants in the air. The court held that the record indicated that Jailynn understood the risks associated with cheerleading and that Raven and Charlotte's failure to provide safety mats and allowing the participants to practice on the grass did not rise to the level of recklessness.

{¶ 17} Jailynn and Marketa (hereafter "Appellants") now appeal from the trial court's decision granting summary judgment in favor of Raven and Charlotte, raising a single assignment of error for review. Under their sole assignment of error, Appellants claim that summary judgment was improper because a genuine issue of material fact exists as to whether Raven and Charlotte's conduct was reckless. Specifically, Appellants argue that the trial court erred in only addressing Raven and Charlotte's failure to provide safety mats on the grass and by failing to consider the opinion of their expert,

Dr. Rabinoff, which they claim created a genuine issue of material fact.

### III. Standard of Review

{¶ 18} Civ. R. 56 defines the standard to be applied by the trial court when determining whether a motion for summary judgment should be granted. *Todd Dev. Co., Inc. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 11. Summary judgment is proper when: "(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." (Citation omitted.) *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶ 19} "To prevail on its motion for summary judgment seeking to dismiss a claim, the movant must demonstrate the absence of a genuine issue of material fact on the essential elements of the non-moving party's claims." *Omega Riggers & Erectors, Inc. v. Koverman*, 2016-Ohio-2961, 65 N.E.3d 210, ¶ 29 (2d Dist.). It is well established that:

> The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has

a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

(Emphasis sic.) *Dresher v. Burt,* 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).

{¶ 20} Appellate courts review summary judgment decisions de novo. *Grafton* at 105. " 'De Novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial.' " *Harris v. Dayton Power & Light Co.*, 2d Dist. Montgomery No. 25636, 2013-Ohio-5234, ¶ 11, quoting *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997). It requires an " 'independent review of the trial court's decision without any deference to the trial court's determination.' " *Jackson v. Internatl. Fiber*, 169 Ohio App.3d 395, 2006-Ohio-5799, 863 N.E.2d 189, ¶ 17 (2d Dist.), quoting *State ex rel. AFSCME v. Taft*, 156 Ohio App.3d 37, 2004-Ohio-493, 804 N.E.2d 88, ¶ 27 (3d Dist.). In other words, " '[w]e stand in the shoes of the trial court and conduct an independent review of the record.' " *Auer v. Paliath*, 2d Dist. Montgomery No. 27004, 2016-Ohio-5353, ¶ 15, quoting *Deutsche Bank Nat. Trust Co. v. Doucet*, 10th Dist. Franklin No. 07AP-453, 2008-Ohio-589, ¶ 8.

## IV. Recklessness

{¶ 21} Appellants do not dispute that cheerleading is a recreational activity and that "[u]nder the doctrine of primary assumption of the risk, a plaintiff voluntarily engaged in a recreational activity assumes the inherent risks of that activity and cannot recover for

injuries sustained while engaging in that activity *unless the defendant acted recklessly or intentionally in causing the injuries.*" (Emphasis added.) *Wolfe v. AmeriCheer, Inc.*, 10th Dist. Franklin No. 11AP-550, 2012-Ohio-941, ¶ 14, citing *Marchetti v. Kalish*, 53 Ohio St.3d 95, 100, 559 N.E.2d 699 (1990), syllabus. (Other citation omitted.) Appellants also do not dispute that falling and injury are inherent risks of cheerleading. Further, Appellants agree that in order to recover for Jailynn's injuries, they must establish that Raven and Charlotte acted recklessly or intentionally. Appellants have also clarified that they are not claiming Raven and Charlotte acted intentionally, but only claim that their conduct was reckless.

{¶ 22} Ordinarily the question of whether conduct was reckless is properly left for a jury. *Id.* at ¶ 17, citing *Matkovitch v. Penn Cent. Transp. Co.*, 69 Ohio St.2d 210, 214, 431 N.E.2d 652 (1982); *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 75. "Nevertheless, the [Supreme Court of Ohio] has not hesitated to find summary judgment appropriate where the facts, when construed in favor of the nonmoving party, fail to rise to the level of reckless conduct." *Kurz v. Great Parks of Hamilton Cty.*, 2016-Ohio-2909, 65 N.E.3d 96, ¶ 26 (1st Dist.), citing *O'Toole* at ¶ 92. In *Seege v. Smith*, 2d Dist. Montgomery No. 26210, 2014-Ohio-5450, we also recognized that the determination of recklessness is typically within the province of the jury, but that summary judgment remains appropriate where a defendant's conduct fails to demonstrate a disposition to perversity. (Citations omitted.) *Id.* at ¶ 35.

{¶ 23} That said, "[r]ecklessness is a high standard." *Lovegrove v. Stapleton*, 2015-Ohio-1669, 32 N.E.3d 1001, ¶ 34 (2d Dist.), citing *Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶

37. " 'While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it.' " *Thompson v. McNeill*, 53 Ohio St.3d 102, 105, 559 N.E.2d 705 (1990), *abrogated on other grounds*, *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 31, quoting 2 Restatement of the Law 2d, Torts, Section 500 (1965). "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34, citing *Thompson* at 104-105.

{¶ 24} " 'The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of risk, but this difference of degree is so marked as to amount substantially to a difference in kind.' " *Taylor v. Mathys*, 3d Dist. Union No. 14-04-32, 2005-Ohio-150, ¶ 15, quoting 2 Restatement of the Law 2d, Torts, Section 500. For an act to be reckless, " 'the risk must itself be an unreasonable one under the circumstances.' " *Thompson* at 105, quoting 2 Restatement of the Law 2d, Torts, Section 500. " 'What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, *i.e.*, the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game.' " *Wolfe*, 10th Dist. Franklin No. 11AP-550, 2012-Ohio-941 at ¶ 19, quoting *Thompson* at 105. "Therefore, in order for a participant's conduct to be reckless, it must be both outside the rules of the activity and create an unreasonable risk of harm." *Taylor* at ¶ 17.

{¶ 25} In *Wolfe*, a cheerleader filed a complaint against AmeriCheer Inc., a corporation that sponsored cheerleading competitions, because the cheerleader was

seriously injured during a cheerleading competition while she was acting as a base. *Id.* at ¶ 1-3. The cheerleader alleged that AmeriCheer exercised reckless disregard for her safety because two of the three spotters provided by AmeriCheer were not in the proper positions at the time of her injury. *Id.* at ¶ 4, 20. The relevant issue was whether the injured cheerleader set forth competent evidence establishing a genuine issue of material fact on the issue of recklessness. *Id.* at ¶ 16.

{¶ 26} The Tenth Appellate District found that evidence regarding reckless misconduct was lacking in *Wolfe* because there was unrefuted evidence that AmeriCheer was under no duty to provide spotters at its competitions. *Id.* at ¶ 25. There was also no evidence presented that AmeriCheer inadequately trained its spotters. *Id.* In addition, the court found that there was no evidence that the spotters themselves recognized any facts that would have led them to believe that their conduct could or did create an unreasonable risk of harm to another. *Id.* at ¶ 26. Thus, the court found the spotters' actions were at best negligent and that there was no genuine issue of material fact as to recklessness. *Id.*

## V. Analysis

{¶ 27} In this case, we find that no genuine issue of material fact exists with respect to recklessness as it relates to Charlotte. The record indicates that Charlotte was not a cheerleading coach, but rather a basketball coach who trained many young athletes in her community. While Charlotte would sometimes help the girls Raven was mentoring with their fitness and conditioning when they had cheerleading practice at her residence, Jailynn admitted that Charlotte never provided instruction or advice regarding

cheerleading. In addition, Jailynn's expert, Dr. Rabinoff, stated in his affidavit that Charlotte "was responsible for the fitness and conditioning aspect of the team." Accordingly, there is no evidence in the record that Charlotte was ever responsible for supervising or training the girls on any aspect of cheerleading, stunting, or spotting. There is also no evidence that Charlotte had any input in when, where, or how the girls practiced. As a result, we do not find that Charlotte had or breached any duty towards Jailynn with respect to instructing and supervising stunting skills, as it is clear from the record that Charlotte had a de minimus connection to the team and did not provide such instruction.

**{¶ 28}** We also find that there is no genuine issue of material fact as to recklessness with regards to Raven. As previously noted, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another *that is unreasonable under the circumstances and is substantially greater than negligent conduct.*" (Emphasis added.) *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266 at ¶ 34, citing *Thompson*, 53 Ohio St.3d at 104-105, 559 N.E.2d 705. The risk of harm itself must be unreasonable under the circumstances, and, in the context of sports, what constitutes an unreasonable risk is delineated by references to the customs that shape the participants' ideas of foreseeable conduct in the course of participating in the sport at issue. *Thompson* at 104-105. "It is clear that some actions which are outside of the rules or customs of the sport do not create an unreasonable risk of harm and, thus, are not reckless. An example would be a football player who commits a holding penalty." *Taylor*, 3d Dist. Union No. 14-04-32, 2005-Ohio-150 at ¶ 17.

**{¶ 29}** Based on the facts of this case, even when they are viewed in a light most

favorable to Jailynn, we cannot say that the risk of harm at issue here is an unreasonable one that is substantially greater than the degree of risk associated with negligent conduct. The risk of harm posed by Raven holding cheerleading practices at her parents' house in the manner that she did is that a squad member may fall or otherwise injure herself while performing stunts on a grass surface. As noted by the trial court, falling is an inherent risk of performing stunts where participants are lifted into the air.

{¶ 30} Jailynn was clearly aware of the risk of falling prior to her injury, as she had previously attended multiple practices at the Harris residence and successfully performed various stunts as a flyer. When Jailynn performed the liberty stunt that injured her, which she agreed was a routine lift, she was practicing on the grass as usual and was surrounded by three or four spotters. Raven was present when Jailynn performed the stunt, although Raven was admittedly distracted and not watching the stunt when Jailynn fell. Regardless of Raven's distraction, her conduct of instructing and permitting the girls to practice stunts on her parents' grassy front yard with multiple spotters fails to demonstrate a disposition to perversity.

{¶ 31} Under these circumstances, we do not find that the practice location, lack of mats, and training techniques created an *unreasonable* risk of harm, as the fact remains that the risk amounted to falling on grass, and falling is an inherent risk of the activity. Moreover, the record establishes that it was customary for the rather informal cheerleading squad to practice stunts on the grass with spotters, and that Jailynn and her teammates had performed similar lifting stunts multiple times under the same conditions without incident. Simply put, the risk of harm associated with the stunt at issue was not unreasonable under the circumstances so as to rise to the standard of recklessness.

Rather, we find the degree of risk is more akin to negligence.

{¶ 32} The fact that Jailynn submitted Dr. Rabinoff's expert affidavit opining that Raven's conduct amounted to recklessness does not affect our decision. " '[J]ust because a plaintiff can find an expert to state in an affidavit that an act was reckless does not mean that there is a genuine issue for trial.' " *Seege,* 2d Dist. Montgomery No. 26210, 2014-Ohio-5450 at ¶ 34-35, quoting *Fediaczko v. Mahoning Cty. Children Servs.,* 7th Dist. Mahoning No. 11 MA 186, 2012-Ohio-6090, ¶ 31.

{¶ 33} We recognize that Dr. Rabinoff's affidavit is very thorough in that he supports his recklessness opinion by discussing the specific ways in which Raven failed to abide by certain standards in the American Association of Cheerleading Coaches and Administrators Cheerleading Safety Manual and the USA Gymnastic Safety Manual. However, regardless of these failures, the facts as they stand do not indicate that such failures created an *unreasonable* risk of harm under the circumstances.

{¶ 34} That Dr. Rabinoff claims an unreasonable risk of harm existed here is akin to alchemy, i.e., turning lead into gold, as he is attempting to turn facts that do not show an unreasonable risk of harm into facts that do show an unreasonable risk of harm by simply averring in his affidavit that Raven's conduct created such harm. It is well-established that " 'a court may disregard conclusory allegations in an affidavit unsupported by factual material in the record.' " *H&H Properties v. Hodkinson*, 10th Dist. Franklin No. 10AP-117, 2010-Ohio-5439, ¶ 11, quoting *Rice v. Johnson*, 8th Dist. Cuyahoga No. 63648, 1993 WL 328733, *4 (Aug. 26, 1993). " 'Affidavits which merely set forth legal conclusions or opinions without stating supporting facts are insufficient to meet the requirements of Civ.R. 56(E).' " *Nu-Trend Homes, Inc. v. DeLibera, Lyons &*

*Bibbo*, 10th Dist. Franklin No. 01AP-1137, 2003-Ohio-1633, ¶ 59, quoting *Stamper v. Middletown Hosp. Assn.*, 65 Ohio App.3d 65, 68-69, 582 N.E.2d 1040 (12th Dist.1989).

**{¶ 35}** Because the facts in the record do not demonstrate that Raven's conduct created an unreasonable risk of harm, we find that Raven's conduct does not rise to the high standard of recklessness, but rather, is more indicative of negligence, which is insufficient to succeed on the personal injury claim herein.

**{¶ 36}** Appellant's sole assignment of error is overruled.

### VI. Conclusion

**{¶ 37}** Having overruled Jailynn Brown's sole assignment of error, the trial court's decision granting summary judgment in favor of Charlotte Harris and Raven Evans-Harris is affirmed.

. . . . . . . . . . . .

HALL, P.J., concurs.

DONOVAN, J., concurring in part and dissenting in part:

**{¶ 38}** I respectfully dissent only as to the majority's determination regarding Raven. Raven owed a duty to Jailynn not to increase the risk of harm beyond what is inherent in the activity of stunting. There is evidence in the record that Raven did increase the risk of harm and/or took the team beyond its level of expertise or capability. Under the circumstances herein, and construing the evidence most strongly in favor of Jailynn, in my view the question of whether Raven's conduct was reckless, such that it

fell totally outside of the range of ordinary activity involved in coaching stunting, cannot be resolved on summary judgment. The affidavit of Dr. Rabinoff, which the trial court disregarded without justification, creates a genuine issue of material fact for the jury to decide as to whether Raven elevated the risk beyond what is inherent in stunting or behaved recklessly. There is expert testimony that Raven's acts and omissions fell totally outside the range of ordinary activity.

{¶ 39} Dr. Rabinoff has 45 years of experience, and his affidavit does not merely set forth a legal conclusion or opinion without supporting facts, as the majority suggests. His affidavit is thorough and his opinions are supported by specific facts from the record. Most significantly, Dr. Rabinoff opined that Raven failed to implement the proper instruction and training required for safe stunting by means of established standards, and that her failure created a substantial and unjustifiable risk of harm. This opinion directly conflicts with that of the Harrises' expert, who opined that the circumstances surrounding Jailynn's injury are common and do not demonstrate reckless conduct, thereby creating a genuine issue of material fact.

{¶ 40} Dr. Rabinoff specifically cited standards from the USA Gymnastics Safety Manual, which provides that "the cheering surface, location and weather conditions should be taken into consideration before engagement activity. Basic mats and/or landing mats and skill cushions should be used for tumbling, stunts and dismounts, especially in the training environment." Dr. Rabinoff opined that Raven disregarded these safety precautions by teaching students stunts in a grassy front yard that was uneven and sloped without safety mats or any other alternative safety measures. Raven herself testified that mats would have been helpful in performing the stunts, but that she

did not have any.

{¶ 41} In further support of his opinion, Dr. Rabinoff explained that according to the American Association of Cheerleading Coaches and Administrators Cheerleading Safety Manual, stunting techniques are supposed to be taught "using a well-planned, systematic program that emphasizes the use of appropriate skills progressions that are scrupulously monitored by the coach."   He claims the manual further provides that "these progressions usually involve a series of 'lead up' skills that often require some form of spotting."   Even absent application of these standards, a coach, even a volunteer one, owes a duty not to increase the risk of harm beyond what is inherent in the learning process undertaken by a student who is a minor.

{¶ 42} According to Dr. Rabinoff, "the girls were not instructed on, and did not consistently and successfully perform, proper skills progressions before attempting the 'liberty' stunt[,]" which he described as "one of the most advanced and high risk type of stunts."   We note that the Harrises' expert, in contrast, described the stunt as "fairly basic."   Dr. Rabinoff claimed "it would be merely impossible for girls of that age and experience to perform all of the necessary skills progressions for the liberty in one day." While there is conflicting testimony as to whether Jailynn had practiced and performed the liberty stunt previously, facts are to be considered in the light most favorable to the Appellants, and Jailynn testified that Raven first taught the liberty during the practice at which she was injured, and that she had never attempted the stunt before that day.

{¶ 43} Dr. Rabinoff also found fault with Raven's technique of walking the girls through the stunt and then having them simply perform the stunt until they were comfortable with it.   Dr. Rabinoff further took issue with the manner in which Raven

assessed Jailynn's skills that were necessary to complete the stunts, which Raven claimed she did on a "trial and error" basis, i.e., "[b]y putting [Jailynn] up there and seeing how she did." Further, Dr. Rabinoff noted that Raven testified that she was unsure whether any spotters were around Jailynn at the time of the stunt in question, and he claimed that Raven did not appreciate the concept of spotting since she testified that "there's not a lot of technique involved in being a spotter." Dr. Rabinoff also implied that the lack of direct supervision at the time Jailynn performed the liberty stunt was inappropriate, as Raven testified that her attention was turned away when Jailynn fell. As a result of these failures, Dr. Rabinoff concluded that "*all* of the 'standards of care' for the proper teaching/coaching of 'gymnastics stunting' cheerleading that [he applied] to the facts of this case were violated," and that Raven "consciously subjected the members of the team, including Jailynn Brown, to a substantial and unjustifiable risk of harm." (Emphasis added).

{¶ 44} Because Dr. Rabinoff pointed to established standards and specific facts in the record to support his opinion, an opinion that was directly contrary to that of the Harrises' expert, I find that the affidavit creates a genuine issue of material fact as to whether Raven consciously disregarded a known or obvious risk of unreasonable harm to Jailynn and the other participants that amounts to more than mere negligent conduct. In other words, in my view, the question of whether Raven's conduct was reckless should be up to a jury to decide. I would reverse in part.

. . . . . . . . . .

Copies mailed to:

Nathan J. Stuckey
Alan Trenz
Hon. Dennis J. Adkins